UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Samuel Brooks

    v.                                    Civil No. 19-cv-1060-LM
                                              Opinion No. 2020 DNH 105
Andrew Saul, Commissioner,
U.S. Social Security
Administration


**O R D E R**

    Pursuant to 42 U.S.C. § 405(g), Samuel Brooks seeks
judicial review of the decision of the Commissioner of the
Social Security Administration denying his application for
disability insurance benefits ("DIB").  Brooks moves to reverse
the Commissioner's decision, contending that the Administrative
Law Judge ("ALJ") erred by assigning improper weight to the
medical opinions in the record.  The Administration moves to
affirm.  For the reasons discussed below, the decision of the
Commissioner is affirmed.


**STANDARD OF REVIEW**

    In reviewing the final decision of the Commissioner under
Section 405(g), the court "is limited to determining whether the
ALJ deployed the proper legal standards and found facts upon the
proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35
(1st Cir. 1999); accord Seavey v. Barnhart, 276 F.3d 1, 9 (1st

Cir. 2001).  The court defers to the ALJ's factual findings as long as they are supported by substantial evidence.  42 U.S.C. § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016).  "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not."  Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (citation omitted).  Rather, the court "must uphold the Commissioner's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support her conclusion."  Id. (citation, internal modifications omitted).

## DISABILITY ANALYSIS FRAMEWORK

To establish disability for purposes of the Social Security Act (the "Act"), a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  The claimant "has the burden of production and proof

at the first four steps of the process." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  The first three steps are: (1) determining whether the claimant is engaged in substantial gainful activity; (2) determining whether he has a severe impairment; and (3) determining whether the impairment meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant meets his burden at the first two steps of the sequential analysis, but not at the third, an ALJ assesses the claimant's residual functional capacity ("RFC"), which is a determination of the most a person can do in a work setting despite the limitations caused by his impairments. Id. §§ 404.1520(e), 404.1545(a)(1); see also S.S.R. No. 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996).  At the fourth step of the sequential analysis, the ALJ considers the claimant's RFC in light of his past relevant work. Id. § 404.1520(a)(4)(iv).  If the claimant can perform his past relevant work, the ALJ will find that the claimant is not disabled. See id. If the claimant cannot perform his past relevant work, the ALJ proceeds to the fifth step, at which it is the Administration's burden to show that jobs exist in the economy which the claimant can do in light of his RFC. See id. § 404.1520(a)(4)(v).

## PROCEDURAL HISTORY

Brooks filed an application for disability insurance benefits on May 16, 2016.  He initially alleged a disability onset date of January 1, 2016, which he subsequently amended to December 31, 2015.  He alleged that he was disabled due to epilepsy, arthritis, "back issues," and high blood pressure. Brooks met the insured status requirements of the Act through March 31, 2017.

After the Administration denied Brooks's application on May 11, 2017, Brooks requested a hearing before an ALJ.  The ALJ held an initial hearing on March 16, 2018, and a second hearing on December 12, 2018.  Brooks testified at both hearings. Brooks's wife also testified at the first hearing, and reviewing consultative physician John F. Kwock, M.D., and impartial vocational expert Susan Howard also testified at the second.

The ALJ issued an unfavorable decision on December 27, 2018.  She found that Brooks had a combination of severe impairments consisting of degenerative disc disease, degenerative joint disease, seizure disorder, depression, obesity, and borderline intellectual functioning.[1]  She did not

---

[1]  The ALJ did not find that Brooks's other medical conditions of record, specifically asymptomatic mitrial valve regurgitation and alcohol abuse in remission, caused or contributed to any severe impairments in Brooks's functional capacities.

find that Brooks's combination of impairments met or equaled the
severity of the impairments listed at 20 C.F.R. § 404, Subpart
P, Appendix 1.

In addition to findings regarding Brooks's mental RFC,
which Brooks does not now challenge, the ALJ found that:

> [T]hrough [his] date last insured, [Brooks] had the
> [physical] residual functional capacity to perform
> light work as defined in 20 CFR 404.1567(b) except
> th[at he] can sit up to 6 hours and stand/walk up to 6
> hours in an eight-hour day.  He can frequently
> push/pull with the lower extremities.  He can
> occasionally climb ramps and stairs, and never climb
> ladders, ropes or scaffolds.  He can occasionally
> balance, stoop, kneel, and crouch, and can never
> crawl.  He should avoid work around unprotected
> heights and heavy machinery.

Admin. Rec. at 24-25.

In connection with her assessment of Brooks's physical RFC,
the ALJ afforded great weight to the opinion of reviewing
consultative physician Dr. Kwock.  She afforded "partial" weight
to the opinion of reviewing agency physician Louis Rosenthall,
M.D., specifically affording "great weight" to his opinion
regarding Brooks's physical RFC in general, but "little weight"
to his opinion that Brooks's back-related impairments were not
severe.  The ALJ afforded little weight to the opinion of
Brooks's treating physician Dennis Badman, M.D.  She did not
expressly address the opinion of examining consultative
physician Frank Graf, M.D.

5

In response to hypothetical questions posed by the ALJ, Howard, the impartial vocational expert, testified to her opinion that a person with Brooks's age, education, past work experience, and RFC could perform the job duties of a cleaner, a price marker, and a garment folder.  Based on this testimony, the ALJ found at Step Five of the sequential process that Brooks had not been disabled for purposes of the Social Security Act at any time between his alleged onset date of December 31, 2015, and his date last insured of March 31, 2017.

On August 26, 2019, the Appeals Council denied Brooks's request for review.  In consequence, the ALJ's decision became the Administration's final order for purposes of judicial review.  20 C.F.R. § 422.210(a); see also, e.g., Sims v. Apfel, 530 U.S. 103, 107 (2000).  This action followed.

## DISCUSSION

Brooks argues that the ALJ erred in affording greater weight to the opinions of reviewing consultative physician Dr. Kwock and reviewing agency physician Dr. Rosenthall than to that of treating physician Dr. Badman.  Brooks further argues that the ALJ erred in failing to address the opinion of examining consultative physician Dr. Graf.  The court addresses these arguments below.

I.   Background

A detailed recital of Brooks's medical history can be found in Brooks's statement of facts (doc. no. 10) as supplemented by the Commissioner's statement of facts (doc. no. 12), and in the transcript of the administrative record (doc. nos. 6, 8).  The court provides a summary of the material medical history and other material background information here.[2]

A.   Brooks's Work History

Brooks owned and operated his own flooring installation business from 1984 to 2011.  Admin. Rec. at 212-220, 229-236. From 2011 through at least March 16, 2018, the date of the first hearing before the ALJ, he owned and operated his own firewood business.  Id.  Brooks reported that as of January 2016, he was working 8-10 hours per day and 5-6 days per week operating the firewood business.  Id. at 230.  This work entailed cutting down trees, transporting felled trees on a skidder, delimbing the trunks, transporting them by truck, and cutting and splitting them for firewood.  Id.  As of March 16, 2018, Brooks reported that he continued to perform such work as permitted by his pain

---

[2]  Brooks's assignments of error exclusively address the ALJ's consideration of medical opinions dating from after his date last insured.  To provide context for discussion of Brooks's arguments, the court summarizes the material medical records and other record evidence dating from prior to his date last insured.

symptoms, or approximately 20-30 hours per month.  Id. at 829-831, 839, 844.


B.   Brooks's Medical History:  Prior to His Alleged
     Disability Onset Date

The record suggests that Brooks may have begun suffering chronic lower back pain beginning in or around 2001.  During a June 2017 consultation at a pain clinic, Brooks reported to his treating nurse that although his condition had recently worsened after he suffered a fall, he "ha[d] had th[e] pain [in his lower back] for over 15 years."  Id. at 404.  Moreover, although the earliest available medical record that addresses Brooks's back pain symptoms is dated May 18, 2015, id. at 306, at that time Brooks was already on an established regimen of oxycodone for control of those symptoms, id. at 306-309.

On January 6, 2015, Brooks reported to his treating nurse that he had recently begun experiencing a metallic taste in his mouth.  Id. at 319-322, 347-350.  As discussed below, Brooks's treatment providers later determined that this symptom was indicative of a possible seizure disorder.

On May 18, 2015, Brooks reported to his nurse that his lower back pain had worsened to the point that he was considering applying for disability benefits.  Id. at 306.

Following an imaging study that same day, Brooks was diagnosed with degenerative disc disease of the lumbar spine.  Id. at 340.

On June 22, 2015, Brooks reported that he had been experiencing episodes of "spacing out," during which he would stop talking mid-conversation and stare into space.  Id. at 276-279, 302-305, 342-346.  On September 1, 2015, he reported that these episodes were occurring in conjunction with his experience of a metallic taste in his mouth.  Id. at 299-301.

On October 14, 2015, Brooks consulted with neurologist Rohit Marawar, M.D.  Id. at 272-275, 332-335.  Although at that time Brooks had never suffered a classic seizure, Dr. Marawar advised him that his symptoms of "spacing out" with a metallic taste in his mouth were consistent with a diagnosis of epilepsy. Id.

C.   Brooks's Medical History:  Between His Alleged
     Disability Onset Date and His Date Last Insured

As noted, Brooks applied for disability benefits on May 16, 2016.  Id. at 176-182.  He initially alleged disability as of January 1, 2016, later amending his alleged onset date to December 31, 2015.

On June 16, 2016, Brooks had a seizure while driving—his first "classic" seizure—in the course of which he crashed his car into a telephone pole.  Id. at 352-357, 372.  After

recovering consciousness, he was highly confused for several minutes.  Id.  His driver's license was suspended after the incident.  Id.

On June 20, 2016, Brooks's wife filled out a Function Report in support of Brooks's DIB application.  Id. at 221-228. In that report, she indicated that Brooks's daily routine was to drive to a job site, cut trees, load cut wood into trucks, drive the load home, and cut the load into firewood.  Id. at 222.  She expressed her concern that, in light of his seizure four days previously, it was no longer safe for him to drive on the roads, to operate a log skidder, or to be alone out in the woods operating a chain saw.  Id. at 221, 228.  She indicated that while he had always been able to work through pain symptoms in the past, the seizure and his resulting inability to drive marked a "turning point" that she felt prevented him from being able to work.  Id. at 226, 228.

Brooks had a second seizure on July 23, 2016.  Id. at 372-375, 430-445.  That same day, Brooks underwent an MRI study, the findings of which were broadly normal.  Id.  Blood tests established that he was extremely low in sodium.  Id.  After Brooks reported to emergency room care providers that he had consumed at least 18 beers a day for the last several years, those care providers opined that his hyponatremia (low sodium) was likely a consequence of his excessive beer consumption.  Id.

They further opined that his seizures might have been caused by hyponatremia rather than by epilepsy or another seizure disorder.  Id.

In September 2016, Brooks consulted with examining neurologist George P. Thomas, M.D.  Id. at 372-375.  Dr. Thomas opined that it was possible that Brooks's "staring spells," in which he would stop talking mid-conversation, "might be absence seizures or very well could be behavioral" in origin, while his more recent experience with classic seizures "sounds very much like an epileptic seizure[], but seems to have been provoked by hyponatremia."  Id. at 374.

On February 7, 2017, Brooks underwent an X-Ray study of his lumbar spine.  Id. at 402, 514.  That study showed "slight interval compression" relative to the study of May 18, 2015, which underlay his diagnosis with degenerative disc disease. Id.

As noted, Brooks's date last insured was March 31, 2017.


D.   Brooks's Medical History:  After His Date Last Insured

On May 3, 2017, consultative physician Dr. Frank Graf examined Brooks.  Id. at 398-400.  Although his examination was largely orthopedic and focused on symptoms and impairments associated with Brooks's degenerative disc disease, Dr. Graf additionally noted that Brooks presented with irregularities in

11

his extraocular eye motions and in ocular responsiveness to
light.  Id. at 399.  Dr. Graf opined that these irregularities
were indicative of underlying neurological abnormalities.  Id.

On the basis of his physical examination, Dr. Graf
concluded that:

> [Brooks] is substantially impaired in basic functional
> movement patterns referencing the lumbosacral spine
> and there is a disorder of concentration and pace and
> motor functions.  This has not been specifically
> diagnosed but has been considered to be a seizure
> disorder.

Id. at 400.  Brooks now observes, correctly, that the ALJ failed
to address Dr. Graf's opinion in her written decision.

On May 11, 2017, agency physician Dr. Rosenthall reviewed
Brooks's medical record.[3]  Id. at 69-79.  On the basis of his
review, Dr. Rosenthall assessed Brooks's physical RFC,
specifically with reference to the period between his amended
alleged disability onset date of December 31, 2015, and his date
last insured of March 31, 2017.  Id. at 69-79.  Dr. Rosenthall
found that Brooks's impairments relating to his possible seizure
disorder were severe.  Id. at 76-77.  Dr. Rosenthall concluded,
however, apparently on the basis of Brooks's activities of daily
living (including wood-cutting and walks of at least half a mile

---

[3]  Dr. Rosenthall expressly considered and gave weight to
Dr. Graf's medical opinion.  Id. at 70, 73-74.

without assistance), that the impairments relating to his
degenerative disc disease were not severe.  Id.

Dr. Rosenthall specifically opined that Brooks could
occasionally lift 20 pounds and frequently lift ten pounds, that
he could stand or walk for about six hours of an eight-hour
workday, and that he could sit for about six hours of a workday.
Id. at 75.  He opined that Brooks could occasionally climb ramps
or stairs, balance, stoop, kneel, crouch, or crawl, but that,
due to his seizure disorder, he should never climb ladders,
ropes, or scaffolds or be exposed to hazards of any kind.  Id.

The ALJ gave great weight to Dr. Rosenthall's opinion,
except that she gave little weight to his opinion that Brooks's
impairments related to his degenerative disc disease and
associated back pain were not severe.  Brooks now argues that
the ALJ erred in affording great weight to any portion of Dr.
Rosenthall's opinion.

Also on May 11, 2017, in part on the basis of Dr.
Rosenthall's assessment of Brooks's physical RFC, the
Administration found Brooks not disabled and denied his DIB
application.  Id. at 80-81.  The Administration's stated basis
for the denial was that Brooks's medical records supported the
determination that he was physically capable of work at the
light exertional level.  Id. at 81.  Brooks requested a hearing
before an ALJ to reconsider the Administration's decision.

On June 9, 2017, Brooks began seeking treatment at a pain clinic where, as noted, he reported that his chronic back pain of 15 years had recently worsened after a fall.[4]  Id. at 404. Brooks received treatment from the pain clinic from June 2017 through at least February 2018.  Id. at 402-429, 634-659. During that time, Brooks underwent regular physical examinations by John Kane, A.P.R.N., C.R.N.A.  Id.  Nurse Kane consistently and regularly found that Brooks's gait and station were normal, and that he had normal strength and normal range of motion in both arms and both legs.  Id. at 405-406, 409-410, 414, 417, 420-421, 423-424, 427, 635-636, 639-640, 643-644, 647-648, 651-652, 655.

On June 26, 2017, Kane referred Brooks for an MRI of his lumbar and sacral spine.  Id. at 446-447.  The study revealed mild lumbar disc space narrowing and severe sacrolumbar disc space narrowing, mild to moderate disc bulges, and normal vertebral bodies without evidence of compression.  Id.

On July 31, 2017, Brooks consulted with Dr. Badman.  Id. at 717-718, 767-768.  This was Brooks's first consultation with Dr. Badman following a 15- to 17-year hiatus in their treatment relationship.  Id.  Brooks advised Dr. Badman that he was re-establishing care because he had "been denied for disability and

---

[4]  There is no other mention of this fall elsewhere in the record.

14

was told it was because his current providers are not MD's."
Id. at 717, 767.  At that consultation, Dr. Badman's examination
did not disclose any material health issues.  Id. at 718, 768.
To the contrary, Dr. Badman expressly noted that Brooks's gait
was "good" without assistance.  Id.  However, Dr. Badman
recorded that he had "concerns" regarding Brooks's reported
chronic low back pain.  Id.

On September 10, 2017, Brooks suffered three "classic"
seizures, the third of which occurred while he was under
observation at the emergency room.  Id. at 448-497.  A CT scan
of the head following the seizures revealed no abnormalities.
Id. at 465, 478.

Brooks attended a follow-up appointment with Dr. Badman on
September 14, 2017.  Id. at 715-716, 765-766.  On physical
examination, Dr. Badman noted no material health issues but
rather observed that Brooks ambulated normally without
assistance and that his extremities were "unremarkable and
symmetric."  Id.  On a return visit of October 11, 2017, Brooks
reported feeling well, and Dr. Badman again recorded no material
health issues, observing that Brooks was ambulating normally
without assistance and that he presented with unremarkable,
symmetric extremities.  Id. at 712, 762.  In connection with
both the consultation of September 14 and that of October 11,
2017, Dr. Badman expressly noted that he had not had the

15

opportunity to review any of Brooks's medical records from his other care providers.  Id. at 712, 715-716, 762, 765-766.

Brooks returned to Dr. Badman on February 24, 2018, "to review and complete disability paperwork for his attorney."  Id. at 711, 761.  Again, Dr. Badman's treatment notes record no observations of material health issues.  Id.  Dr. Badman also expressly noted once again that he had not had an opportunity to review any of Brooks's other medical records.  Id.  That same day, Dr. Badman filled out a medical opinion form provided by Brooks's attorney.  Id. at 660-664.

On the attorney-provided form, Dr. Badman opined that, due to his degenerative disc disease and associated back pain, Brooks was able to sit or stand for only fifteen minutes before needing to change his posture, that in an eight-hour work day Brooks would be able to sit, stand, or walk for a total of less than two hours, and that he would need to walk for five minutes every fifteen minutes.  Id. at 661-662.  He opined that while "engaging in occasional standing/walking," Brooks would need to use a cane or other assistive device, and that he could not walk farther than a single city block "without rest or severe pain."  Id.

Regarding the use of Brooks's arms, Dr. Badman opined that he could only reach with his right arm for 75% of a workday and with his left arm for 50% of a workday.  Id. at 663.  He opined

16

that Brooks could occasionally carry ten pounds and never any greater weight.  Id.  He further opined that Brooks could occasionally twist or climb stairs, but never stoop, crouch, or climb ladders.  Id.

Dr. Badman opined that Brooks would need to take frequent unscheduled five-minute breaks during a working day, id. at 662, that he would likely require more than four absences from work per month, id. at 664, and that he was capable of only "low stress jobs," id. at 661.  He opined that Brooks's "experience of pain and other symptoms" would "frequently" interfere with his ability to focus and concentrate on work-related tasks.  Id. at 661.

Finally, Dr. Badman opined that all of Brooks's impairments had "existed since the claimant's alleged onset date of 12/31/2015."  Id. at 660.  Brooks now argues that the ALJ erred in affording little weight to Dr. Badman's opinion of February 24, 2018.

The initial hearing before the ALJ took place on March 16, 2018.  Id. at 820-875.  At that hearing, Brooks testified (inter alia) that he spent twenty or thirty hours per month cutting and splitting firewood and operating a logging skidder.  Id. at 829-831, 839, 844.

On June 1, 2018, agency psychologist Thomas F. Burns, Ph.D., performed IQ and other psychological testing on Brooks.

17

Id. at 719-725.  Dr. Burns described Brooks as "very fit looking" with "unremarkable" gait and posture.  Id. at 719. Brooks reported to Dr. Burns that, as of that time, he was happy that "his work enable[d] him to be in the woods, generally by himself, operating a skidder as a part of his own logging operation."  Id. at 723.[5]

A second hearing took place before the ALJ on December 12, 2018.  Id. at 41-68.  At that hearing, reviewing orthopedic surgeon Dr. Kwock testified.  Id. at 46-55.  Dr. Kwock opined based on his review of Brooks's medical records that Brooks suffered from degenerative disc and joint disease of the lumbar spine.  Id. at 46-47.  He noted that the MRI of June 2017 showed only mild degenerative changes in Brooks's lumbar spine, and opined that because the "severe" disc narrowing of his sacrolumbar spine had caused only a "mild" bulge, Brooks's disc disease would not be expected to prevent him from working at the light exertional level.  Id. at 48-49.  Specifically, he offered his opinion that, as of the alleged onset date of December 31, 2015, Brooks could lift ten pounds frequently and twenty pounds occasionally and could sit or stand/walk for six hours of an eight-hour work day.  Id. at 49.  He testified that Brooks had

---

[5]  On the basis of the tests he administered, Dr. Burns provided an opinion regarding Brooks's mental RFC.  The ALJ afforded great weight to Dr. Burns' opinion, and Brooks does not challenge the ALJ's assessment of his mental RFC.

no limitations in overhead or other reaching with his arms.  Id.
He further testified that Brooks could frequently balance,
kneel, or climb stairs and ramps, occasionally crouch or climb
ladders or scaffolds, and never crawl.  Id.  He stated that
Brooks could occasionally work near heavy machinery or in
unprotected, exposed environments.

Dr. Kwock expressly opined that the record did not contain
any medical evidence "that would even come close" to supporting
Dr. Badman's opinion that Brooks would be limited to sedentary
work or to sitting, standing, or walking for less than two hours
of an eight-hour work day.  Id. at 50.  He specifically noted
that Brooks's MRI revealed none of the "[i]mpingements upon
neurological elements" that would be expected to cause severe
pain symptoms.  Id. at 53-54.  Dr. Kwock acknowledged, however,
that Brooks's degenerative changes could cause pain, that pain
manifestation varies extremely widely across individuals, and
that pain is subjective.  Id. at 51.  He further acknowledged
that none of Brooks's treating sources had ever suggested that
Brooks might be malingering or otherwise exaggerating his
subjective experience of pain.   Id. at 54.

Dr. Kwock stated that his opinion testimony was offered
only as to limitations arising in connection with Brooks's
degenerative disc disease, and not in connection with his
possible seizure disorder, which was outside Dr. Kwock's area of

19

specialty.  Id. at 55.  Brooks now argues that the ALJ erred in
affording great weight to Dr. Kwock's opinion testimony, in
large part because Dr. Kwock declined to opine as to limitations
caused by Brooks's seizure disorder.


II.  ALJ's Consideration of Medical Opinions

    "An ALJ is required to consider opinions along with all
other relevant evidence in a claimant's record." Ledoux v.
Acting Comm'r, Soc. Sec. Admin., Case No. 17-cv-707-JD, 2018 WL
2932732, at *4 (D.N.H. June 12, 2018).  "Medical opinions are
statements from acceptable medical sources that reflect
judgments about the nature and severity of [the claimant's]
impairment(s), including [the claimant's] symptoms, diagnosis
and prognosis, what [the claimant] can still do despite
impairment(s), and [the claimant's] physical or mental
restrictions." 20 C.F.R. § 404.1527(a)(1).

    The ALJ analyzes the opinions of state agency consultants,
examining sources, and treating sources under the same rubric.
See id.; 20 C.F.R. § 404.1527(c).  The ALJ must consider "the
examining relationship, treatment relationship (including length
of the treatment relationship, frequency of examination, and
nature and extent of the treatment relationship), supportability
of the opinion by evidence in the record, [and] consistency with
the medical opinions of other physicians," along with the

doctor's expertise in the area and any other relevant factors. Johnson v. Berryhill, Case No. 16-cv-375-PB, 2017 WL 4564727, at *5 (D.N.H. Oct. 12, 2017).

A.   <u>Treating Physician Dr. Badman</u>

The ALJ afforded little weight to Dr. Badman's medical opinion of February 24, 2018, on the ground that it was inconsistent with other medical evidence of record and unsupported by Dr. Badman's own clinical findings and examination notes.  Admin. Rec. at 30-31.  Brooks argues, without significant analysis, that the ALJ's asserted grounds are legally insufficient to support the weight she assigned to Dr. Badman's medical opinion.  The court disagrees.

"[T]reating physicians' opinions are ordinarily accorded deference in Social Security disability proceeding." Richards v. Hewlett-Packard Corp., 592 F.3d 232, 240 n. 9 (1st Cir. 2010).  This is because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2).  A treating-source opinion is entitled to

controlling weight if it is "well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in [the
claimant's] case record."  20 C.F.R. § 416.927(c)(2).  If,
however, the treating-source opinion conflicts with other
opinions in the record, the ALJ "may reject the opinion of the
treating physician so long as an explanation is provided and the
contrary finding is supported by substantial evidence."
Tetreault v. Astrue, 865 F. Supp. 2d 116, 125 (D. Mass. 2012)
(internal quotation marks, citation omitted).[6]

     Here, the ALJ considered the mandated factors, provided
good reasons for affording little weight to Dr. Badman's
February 24, 2018, opinion, and supported her contrary findings
with substantial evidence.  First, the ALJ noted that Brooks and
Dr. Badman had a previous treatment relationship, and that
Brooks re-established care with Dr. Badman after a 15-year
hiatus on July 31, 2017, four months after Brooks's date last
insured.  Admin. Rec. at 28.  She discussed in detail each of
Brooks's consultations with Dr. Badman between July 31, 2017,

---

     [6] An ALJ must give "good reasons" for rejecting a treating
source's opinion.  20 C.F.R. § 416.927(c)(2); see also Polanco-
Quinones v. Astrue, 477 Fed. Appx. 745, 746 (1st Cir. 2012)
(unpublished disposition).  Reasons are "good" for this purpose
if they are specific, supportable, and provide a rationale that a
reasonable mind could accept.  See Dimambro v. U.S. Soc. Sec.
Admin., Case No. 16-cv-486-PB, 2018 WL 301090, *10 (D.N.H. Jan.
5, 2018).

and February 24, 2018, summarizing Dr. Badman's material clinical findings from each examination during that period.  Id. at 28-29.  The ALJ correctly noted that Dr. Badman had not reviewed any of Brooks's medical records from other providers at the time he offered his opinion.  Id. at 29.

The ALJ noted, also correctly, that Dr. Badman's contemporaneous treatment and examination notes did not contain clinical findings that could have supported his opinion regarding Brooks's impairments.  Id. at 31.  As noted above, Dr. Badman recorded no clinical findings indicative of any significant impairments.  Id. at 711-716, 761-766.  To the contrary, in connection with each examination he performed, he recorded his observations that Brooks's gait was normal and/or that he ambulated without need for assistance, and that his extremities were unremarkable and symmetric.  Id.  By contrast, Dr. Badman opined on the attorney-provided form that Brooks would need a cane or other assistive device to walk, that he could not walk for more than a single city block without rest or extreme pain, that despite this limitation he would need to walk for five minutes out of every fifteen minutes during an eight-hour work day, that he could sit still for less than two hours out of eight and could stand or walk for less than two hours out of eight, and that he had asymmetrical limitations in his ability to reach with his arms.  Id. at 660-664.  The ALJ

correctly observed that Dr. Badman's opinion as to Brooks's impairments finds no support in his own clinical findings—the only medical evidence available to Dr. Badman at the time he offered his opinion.

The ALJ also correctly noted that Dr. Badman's opinion was inconsistent with other medical evidence of record, perhaps in particular the opinions of reviewing agency physicians Drs. Kwock and Rosenthall.  Id. at 31.  Both of those physicians opined, on the basis of supporting medical evidence, that Brooks was capable of work at the light exertional level and could sit, stand, or walk for six hours out of eight.  Id. at 46-55, 69-79.  The ALJ also noted that Nurse Kane's physical examinations from June 2017 through February 2018 were inconsistent with Dr. Badman's opinion.  Id. at 27-28.  Kane consistently found that Brooks presented with normal gait and station, and normal strength and range of motion in both arms and both legs.  Id. at 405-406, 409-410, 414, 417, 420-421, 423-424, 427, 635-636, 639-640, 643-644, 647-648, 651-652, 655.

Finally, the ALJ supported her contrary findings regarding Brooks's physical RFC with substantial medical evidence.  As discussed in greater detail below, the ALJ assessed Brooks's physical RFC consistently with portions of the medical opinions of Drs. Kwock and Rosenthall.  Id. at 24-27, 29-30.  The ALJ discussed those physicians' opinions in detail, as well as the

24

clinical findings that supported them (including the June 2017
MRI study).  Id.

Brooks has not shown that the ALJ erred in weighing Dr.
Badman's medical opinion.  To the contrary, the ALJ provided
good reasons for rejecting Dr. Badman's opinion and provided
record evidence to support her contrary findings.  Because the
ALJ deployed the proper legal standards and based her
conclusions on substantial medical evidence of record, no
grounds exist for disturbing the Commissioner's final decision
based on the weight the ALJ afforded Dr. Badman's February 24,
2018, opinion.


B.   Reviewing Agency Physician Dr. Rosenthall

The ALJ afforded little weight to one portion of Dr.
Rosenthall's opinion of May 11, 2017, and great weight to the
remainder.  Specifically, to the extent that Dr. Rosenthall
opined that Brooks's impairments in connection with his
degenerative disc disease were not severe, the ALJ found that
the opinion was inconsistent with other medical evidence in the
record, and afforded little weight to his opinion to that extent
only.  Id. at 29-30.  She otherwise found that Dr. Rosenthall's
opinion was well supported and consistent with the longitudinal
record.  Id.

Brooks argues on two grounds that the ALJ erred by crediting any portion of Dr. Rosenthall's opinion.  First, he argues that the ALJ could not properly rely on Dr. Rosenthall's opinion because as of May 11, 2017, Dr. Rosenthall did not have the benefit of the entire medical record (that is, he did not have the benefit of medical evidence dating from after he wrote his opinion).  Second, Brooks argues that, because the ALJ found one portion of Dr. Rosenthall's opinion to be inconsistent with the medical evidence, she could not properly rely on any portion of the opinion.  Again, the court disagrees with Brooks's arguments.

The opinion of a reviewing agency physician must be assessed in light of the absence of a treating or examining relationship between the physician and the claimant, the support given for the opinion, the consistency of the opinion with the record as a whole, and the reviewer's relevant expertise.  See 20 C.F.R. § 404.1527(c)(2)-(6).  Each statement by a medical source reflecting that source's judgment regarding a claimant's impairments constitutes a medical opinion that may properly be weighed independently of the source's other such statements.  See 20 C.F.R. § 404.1527(a), (c).

Here, the ALJ noted that Dr. Rosenthall based his opinion solely on review of Brooks's medical records as they then existed.  The ALJ evaluated the opinion in terms of the support

it received from cited medical evidence and its consistency with other medical evidence of record.  The ALJ found Dr. Rosenthall's opinion regarding the non-severity of Brooks's back-related impairments to be inconsistent both with Dr. Kwock's opinion testimony and with the evidence that had been available to Dr. Kwock but not to Dr. Rosenthall.  Id. at 30. As noted, that evidence included the MRI study of June 2017. Id. at 446-447.  The ALJ found that Dr. Rosenthall's opinion as to Brooks's physical impairments was otherwise well supported and consistent with the medical evidence.  Id. at 29-30.  The ALJ thus assessed Dr. Rosenthall's opinion according to the appropriate metric and supported her findings with substantial medical evidence of record.

Brooks's arguments in support of his assignment of error do not persuade the court to the contrary.  First, as discussed above, the ALJ gave good reasons for crediting the portions of Dr. Rosenthall's opinion to which she afforded great weight. Indeed, it is precisely the portion of Dr. Rosenthall's opinion that conflicted with the later-developed evidence that the ALJ declined to credit.

Second, there is no support in the regulations or case law for Brooks's position that an ALJ must credit either all or none of a medical source's statements.  To the contrary, the regulations make clear that each statement is to be evaluated

for supportability and consistency independently of a source's
other statements.  See 20 C.F.R. § 404.1527(a), (c).

The ALJ deployed the proper legal standards in assessing
Dr. Rosenthall's opinion and based her conclusions on
substantial medical evidence of record.  It follows that no
grounds exist for disturbing the Commissioner's final decision
based on the weight the ALJ afforded Dr. Rosenthall's opinion of
May 11, 2017.


C.   Reviewing Agency Physician Dr. Kwock

The ALJ gave great weight to Dr. Kwock's opinion testimony
of December 12, 2018.  Brooks argues that the ALJ could not
properly rely on Dr. Kwock's opinion because Dr. Kwock testified
only to impairments caused by Brooks's degenerative disc
disease, and not to those caused by his possible seizure
disorder.  Brooks further argues that it was independent error
for the ALJ to credit Dr. Kwock's opinion over that of Dr.
Badman because Dr. Kwock's reasons for disagreeing with Dr.
Badman's opinion were inadequate.  Finally, Brooks argues that
the ALJ independently erred in assigning great weight to any
portion of Dr. Kwock's opinion because the ALJ purportedly
disagreed with one of Dr. Kwock's statements.  None of Brooks's
arguments is persuasive.

First, it is a commonplace for a medical source to opine
only as to a claimant's impairments falling within his or her
area of specialty, and this does not constitute grounds for
discrediting the source's opinion.  Indeed, it would be grounds
for discrediting Dr. Kwock's opinion if he had offered testimony
as to impairments he had no knowledge of or expertise regarding.
See 20 C.F.R. § 404.1527(c).  Moreover, it is clear from the
transcript of Dr. Kwock's testimony that he did not opine that
Brooks's possible seizure disorder could not have caused severe
impairments, but rather merely refrained from testifying to the
nature or severity of any such impairments.  Admin. Rec. at 46-
55.  The ALJ credited Dr. Kwock's testimony as to impairments
caused by Brooks's degenerative disc disorder, but did not infer
from his testimony that Brooks had no other impairments,
including impairments caused by the possible seizure disorder.
Instead, the ALJ credited other medical opinions of record
regarding severe impairments caused by the seizure disorder—
including the opinion of Dr. Rosenthall—and expressly accounted
for them in her assessment of Brooks's physical RFC.  Id. at 24-
31.  There was no error in the ALJ's treatment of Dr. Kwock's
testimony.

Second, the Administration's regulations impose no
obligation on Dr. Kwock to provide any particular quantum of
proof in support of his difference of opinion with Dr. Badman.

Nor was the ALJ obliged to credit Dr. Kwock's opinion only to
the extent Dr. Kwock's reasoning mirrored the standards by which
an ALJ must assess the relative weight of record evidence.  It
is the ALJ, and not any individual medical source, who is
obliged to apply the correct standards in assigning weight to a
medical opinion.

Here, as noted, the ALJ was required to assess the
credibility of Dr. Kwock's opinion in light of the absence of a
treating or examining relationship, the support Dr. Kwock
provided for his opinion, the consistency of the opinion with
the record as a whole, and Dr. Kwock's relevant expertise.  See
20 C.F.R. § 404.1527(c)(2)-(6).  In addition, the ALJ (and not
Dr. Kwock) was required to adhere to the principles set forth in
Social Security Ruling 16-3p.  That Ruling provides in relevant
part as follows:

> In determining whether there is an underlying
> medically determinable impairment that could
> reasonably be expected to produce an individual's
> symptoms, we do not consider whether the severity of
> an individual's alleged symptoms is supported by the
> objective medical evidence.  For example, if an
> individual has a medically determinable impairment
> established by a knee x-ray showing mild degenerative
> changes and he or she alleges extreme pain that limits
> his or her ability to stand and walk, we will find
> that individual has a medically determinable
> impairment that could reasonably be expected to
> produce the symptom of pain.  We will proceed to step
> two of the two-step process, even though the level of
> pain an individual alleges may seem out of proportion
> with the objective medical evidence.

Soc. Sec. Ruling 16-3p, 2016 WL 1119029, S.S.R. 16-3P (S.S.A.
Mar. 16, 2016).

The ALJ proceeded precisely in accordance with Ruling 16-
3p.  Although she credited Dr. Kwock's opinion that Brooks's
condition, while likely to be painful, was unlikely to cause
extreme pain, she nevertheless found that Brooks's condition
"could reasonably be expected to cause the alleged symptoms" of
pain.  Admin. Rec. at 25.  She then proceeded to the next step
of the process, without regard to whether Brooks's reported
subjective pain symptoms might "seem out of proportion with the
objective medical evidence."  S.S.R. 16-3p.  The ALJ did not err
in considering Dr. Kwock's opinion regarding Brooks's subjective
experience of pain.

Third and finally, Brooks argues that it was error for the
ALJ to assign great weight to any portion of Dr. Kwock's opinion
in light of her finding that Brooks's condition could reasonably
be expected to cause symptoms of severe pain.  It is Brooks's
apparent position that Dr. Kwock opined directly to the
contrary, and that because the ALJ rejected that portion of his
opinion she was obliged to reject the opinion in its entirety.
This argument fails as to both its premises.  As discussed
above, Dr. Kwock did not opine that Brooks's condition could not
cause extreme pain.  Instead, Dr. Kwock emphasized that pain is
subjective, that different patients experience pain differently,

and that the same condition can cause differing levels of pain in different individuals.  Admin. Rec. at 50-52.  Moreover, he testified that degenerative changes such as Brooks's would be expected to cause pain.  Id. at 51.  And he declined to offer testimony as to what Brooks's subjective experience of pain might be.  Id.  His testimony that extreme pain associated with degenerative disc disease is generally caused by neurologic impingements not observed in the MRI of Brooks's spine, id. at 48, simply did not constitute denial of the possibility that Brooks might have experienced severe pain.  Perhaps more critically, an ALJ is not limited to crediting either all or none of a medical source's statements, but rather is both authorized and obliged to consider each statement of medical opinion separately.  See 20 C.F.R. § 404.1527(a), (c).

For the reasons discussed above, Brooks has not shown that the ALJ erred in weighing Dr. Kwock's medical opinion.  Because the ALJ deployed the proper legal standards and based her conclusions on substantial medical evidence of record, no grounds exist for disturbing the Commissioner's final decision based on the weight the ALJ afforded Dr. Kwock's opinion of December 12, 2018.

D.   Examining Consultative Physician Dr. Graf

The ALJ did not address the May 3, 2017, opinion of examining consultative physician Dr. Graf.  It is well established that an ALJ is required to consider all of the medical opinions of record.  See 20 C.F.R. § 404.1527(b).  It was, therefore, clear error for the ALJ to fail to address Dr. Graf's opinion in her written decision.

The court does not lightly find that an ALJ's failure to discuss an examining physician's medical opinion of record could constitute harmless error.  As a general rule, such error provides sufficient ground for issuing an order of remand.  See id.  Here, however, remand would amount to an empty exercise, and therefore is not mandated.  See, e.g., Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000).

Dr. Graf offered no opinion as to any specific impairments caused by Brooks's conditions.  The entirety of Dr. Graf's medical judgment regarding Brooks's impairments was, as noted, as follows:

> [Brooks] is substantially impaired in basic functional movement patterns referencing the lumbosacral spine and there is a disorder of concentration and pace and motor functions.  This has not been specifically diagnosed but has been considered to be a seizure disorder.

Admin. Rec. at 400.  In assessing Brooks's physical RFC, the ALJ found, consistently with Dr. Graf's opinion, that Brooks

33

suffered substantial impairments in connection with his degenerative disc disease of the lumbar spine, and that he suffered from a seizure disorder.  Id. at 24-31.

Because the ALJ incorporated the entire substance of Dr. Graf's medical opinion into her assessment of Brooks's physical RFC, and because the ALJ's assessment of Brooks's physical RFC is otherwise adequately supported by substantial record evidence, remand to require the ALJ to consider the opinion expressly would be futile.  See, e.g., Van Ngo v. Saul, 411 F. Supp. 3d 134, 145 (D. Mass. 2019) ("failure to consider a medical opinion in the record may constitute error," but unless the claimant can show "that this error prejudiced his case . . . it is harmless"); Hodgson v. Berryhill, Case No. 18-CV-87-PB, 2018 WL 7504073, at *4 (D.N.H. Oct. 29, 2018), report and recommendation adopted sub nom. Hodgson v. US Soc. Sec. Admin., Acting Comm'r, Case No. 18-CV-87-PB, 2019 WL 1015243 (D.N.H. Mar. 4, 2019) (unpublished disposition); Dubord v. Colvin, Case No. 2:16-CV-00035-JHR, 2016 WL 7396703, at *2 (D. Me. Dec. 20, 2016) (unpublished disposition); Wilner v. Astrue, Case No. 2:11-CV-21-GZS, 2012 WL 253512, at *5 (D. Me. Jan. 26, 2012), aff'd, Case No. 2:11-CV-21-GZS, 2012 WL 484049 (D. Me. Feb. 14, 2012) (unpublished disposition); Baez-Rivera v. Comm'r of Soc. Sec., Case No. 12-1390 MEL, 2014 WL 1275976, at *3 (D.P.R. Mar. 27, 2014) (unpublished disposition); see also Jennings v. Saul,

804 F. App'x 458, 462 (9th Cir. 2020) (harmless error to fail to evaluate a medical opinion of record where the ALJ's assessment of the claimant's RFC was consistent with the unaddressed opinion and contained those limitations that the opinion tended to support) (unpublished disposition).  Accordingly, the court finds that the ALJ's error was necessarily harmless, see Ward, 211 F.3d at 656, and therefore declines to disturb the Commissioner's final decision on the basis of the ALJ's failure to address Dr. Graf's opinion.

## CONCLUSION

For the foregoing reasons, Brooks's motion to reverse (doc. no. 9) is denied, and the Commissioner's motion to affirm (doc. no. 11) is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
LandYa McCafferty
United States District Judge

June 23, 2020

cc:  Counsel of Record